# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AI VISUALIZE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-1458-CFC |
| v. | ) | |
| | ) | |
| NUANCE COMMUNICATIONS INC. | ) | |
| and MACH7 TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' OPENING BRIEF IN SUPPORT OF
## MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)

OF COUNSEL:

David J. Lender
Anish R. Desai
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000

Amanda Branch
WEIL GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel: (650) 802-3000

David Greenbaum
NUANCE COMMUNICATIONS, INC.
1111 Macarthur Blvd.
Mahwah, NJ 07430
Tel: (201) 252-9100

*Attorneys for Defendant Nuance
Communications Inc.*

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

*Attorneys for Defendants Nuance
Communications Inc. and Mach7
Technologies, Inc.*

David M. Pocius
Michael J. Wasco
PAUL FRANK + COLLINS P.C.
One Church Street
Burlington, VT 05402
Tel: (802) 658-2311

*Attorneys for Defendant Mach7*
*Technologies, Inc.*

Dated:  December 27, 2021
7533705 / 52391

## **TABLE OF CONTENTS**

**Page**

I.    NATURE AND STAGE OF THE PROCEEDINGS ......................................1

II.    SUMMARY OF THE ARGUMENT ..........................................................1

III.    BACKGROUND .......................................................................................2

IV.    LEGAL STANDARDS .............................................................................2

V.    THE AIV PATENTS ................................................................................3

    A.    Overview .......................................................................................3

    B.    Representative Claims ...................................................................5

        1.    Group 1: 609 claims 1, 4, 6-9; 167 claim 1; 667 claims 1-3; 397 claims 1-3, 11-14, 16-18 ................................................6

        2.    Group 2: 609 claims 19, 20; 167 claims 6, 7; 667 claims 8, 9 ........................................................................................7

        3.    Group 3: 609 claims 22, 25, 26; 167 claims 9, 12, 13; 667 claims 11, 14, 15 ....................................................................7

VI.    ARGUMENT ............................................................................................8

    A.    *Alice* Step 1: The Asserted Claims Are Directed To Abstract Ideas ............................................................................................8

        1.    Group 1 .............................................................................8

        2.    Groups 2 and 3 ...............................................................10

    B.    *Alice* Step 2: The Claims Lack An Inventive Concept .....................13

        1.    The Claimed Components Are Generic....................................13

        2.    The Claimed Concepts Are Well-Known, Routine And Conventional .................................................................16

    C.    Nothing in the Dependent Claims Supplies An Inventive Concept..........................................................................21

i

VII.   THE REQUEST FOR A FINDING OF WILLFULNESS SHOULD
       BE DISMISSED ..........................................................................................22

VIII.  CONCLUSION...............................................................................................23

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Affinity Labs of Tex. LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) ............................................................ 11, 20

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014) .................................................................... *passim*

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................3

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) ......................................................3

*Bozeman Fin. LLC v. FRB of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020) .........................................................9

*BSG Tech LLC v. Buyseasons, Inc.*,
899 F.3d 1281 (Fed. Cir. 2018) ........................................................ 18, 20

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) .....................................................14

*Content Extraction & Transmission LLC v. Wells Fargo Bank*,
776 F.3d 1343 (Fed. Cir. 2014) ....................................................5, 8

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016) ......................................................2, 15

*Intellectual Ventures I LLC v. Capital One Bank*,
792 F.3d 1363 (Fed. Cir. 2015) ....................................................14

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ......................................................8

*Intellectual Ventures I LLC v. Symantec Corp.*,
234 F. Supp. 3d 601 (D. Del. 2017) ............................................12

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) ....................................................................11

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018) ....................................................................15

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012)........................................................................................18

*Mortg. Grader, Inc. v. First Choice Loan Servs.*,
811 F.3d 1318 (Fed. Cir. 2016) ............................................................. 15, 21

*PersonalWeb Techs. LLC v. Google LLC,*
8 F.4th 1310 (Fed. Cir. 2021) .............................................................. *passim*

*Realtime Data LLC v. Array Networks Inc.,*
C.A. No. 17-0800-CFC, 2021 U.S. Dist. LEXIS 158536 (D. Del. Aug.
23, 2021) ..................................................................................... 3, 10, 20, 22

*Realtime Data LLC v. Array Networks Inc.,*
C.A. No. 17-0800-CFC, 2021 U.S. Dist. LEXIS 84699 (D. Del. May
4, 2021) ........................................................................................................21

*Secured Mail Sols., LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) .............................................................. 11, 18

*Simio, LLC v. FlexSim Software Prods. Inc.*,
983 F.3d 1353 (Fed. Cir. 2020) ....................................................................10

*SynKloud Techs. LLC v. HP Inc.*,
490 F. Supp. 3d 806 (D. Del. 2020) .............................................. 3, 8, 13, 14

*TrackTime, LLC v. Amazon.com, Inc.,*
C.A. No. 18-1518-MN, 2019 U.S. Dist. LEXIS 102375 (D. Del. June
19, 2019) .......................................................................................................16

*Trading Techs. Int'l, Inc. v. IBG LLC*,
921 F.3d 1084 (Fed. Cir. 2019) ....................................................................12

*Ultramercial, Inc. v. Hulu, LLC*,
772 F.3d 709 (Fed. Cir. 2014) ......................................................................14

*ZapFraud, Inc. v. Barracuda Networks, Inc.*,
    528 F. Supp. 3d 247 (D. Del. 2021) .............................................................23

# I.     NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff filed the Complaint against Defendants on October 15, 2021, alleging infringement of its patents.  *See* Complaint, D.I. ¶¶ 227, 288, 304.  This Motion serves as Defendants' response to the Complaint.

# II.    SUMMARY OF THE ARGUMENT

Abstract ideas with no inventive concept are not eligible for patent protection under 35 U.S.C. § 101, and any patent claiming such subject matter is invalid as a matter of law.  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014).  The asserted claims of U.S. Patent No. 9,106,609 (Ex. 1), U.S. Patent No. 8,701,167 (Ex. 2), U.S. Patent No. 9,438,667 (Ex. 3), and U.S. Patent No. 10,930,397 (Ex. 4) (collectively, "AIV Patents") cover precisely such abstract ideas and fail the two-step test set forth in *Alice*.

The AIV Patents are directed to the abstract idea of remotely storing a dataset of images, transmitting the images over the Internet, and displaying the images at a client computer.  Merely implementing this abstract idea on a generic computer and limiting the implementation to a particular type of data, as done by the AIV Patents, does not render the subject matter any less abstract.  The claims of the patents add nothing inventive to the underlying abstract ideas.  Instead, they generically implement these abstract ideas using common computer components and functionality that the patents admit were routine or conventional.  Nothing in the

AIV Patents or Complaint demonstrates otherwise, thus rendering dismissal pursuant to Fed. R. Civ. P. 12(b)(6) appropriate at the pleading stage.

To the extent the Court does not dismiss the Complaint under § 101, Defendants move to dismiss Plaintiff's claims for willfulness and enhanced damages.

## III.   BACKGROUND

The relevant facts are incorporated into the arguments and sections below and are drawn from Plaintiff's Complaint, D.I. 1, to which this Motion is a response, and the asserted AIV Patents.

## IV.   LEGAL STANDARDS

The Supreme Court has set forth a two-part test to determine whether patent claims are invalid under § 101.  *Alice*, 573 U.S. at 217.  The first step requires determining whether the patent claim is directed to a patent-ineligible concept, such as an abstract idea.  *Id*.  If so, the second step requires determining whether the elements of the claim individually, or as an ordered combination, contain an "inventive concept" that transforms the nature of the claim into a patent-eligible application.  *Id*.  "It is well-settled that mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea. Rather, the components must involve more than performance of 'well-understood, routine, conventional activities' previously known to the industry.'"  *In re TLI*

*Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613 (Fed. Cir. 2016). "Results-focused, functional claim language has been a 'frequent feature' of claims found to ineligible under § 101." *SynKloud Techs. LLC v. HP Inc.*, 490 F. Supp. 3d 806, 822 (D. Del. 2020).

"[W]hether a claim recites patent eligible subject matter is a question of law [that] may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). But "not every § 101 determination contains genuine disputes over the underlying facts." *Id*. Indeed, the Court need not accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When there is no dispute of material fact, 101 arguments may be resolved at the pleading stage. *Berkheimer,* 881 F.3d at 1368; *see also e.g.*, *PersonalWeb Techs. LLC v. Google LLC,* 8 F.4th 1310, 1312 (Fed. Cir. 2021) (affirming judgment on the pleadings in a § 101 dispute); *Realtime Data LLC v. Array Networks Inc.*, C.A. No. 17-0800-CFC, 2021 U.S. Dist. LEXIS 158536, at *30 (D. Del. Aug. 23, 2021).

## V.   THE AIV PATENTS

### A.   Overview

The AIV Patents are from the same family and share an identical specification. As characterized by the Plaintiff, the AIV Patents "relate generally to viewing at a client computer a series of three-dimensional virtual views, transmitted over the

Internet, of a volume visualization dataset contained on one or more centralized databases."  Complaint, D.I. 1 ¶ 53.

The specification states that the object of the alleged inventions is to provide: "1) a method and system that overcomes low bandwidth and high latency limitations that are inherent properties of the standard Internet and permits bandwidth usage to be optimized, particularly for interactive web application for visualizing large medical scans and other volume visualization datasets on any Internet connection;" and "2) a method and system that overcomes the problems of maintaining medical records for long periods of time under security and privacy by providing a common and centralized infrastructure for receiving, storing, processing and viewing large medical scans via a web portal where economic [sic] of scale can be applied generously."  609 Patent at 2:37-48.

However, the patents merely invoke generic, conventional components used in their ordinary manner to store, transmit and display data.  The asserted independent claims of the 167 patent recite a "central data storage medium," "server," and "client device."  The asserted independent claims of the 609 patent, 667 patent, and 397 patent recite a "transmitter," "central data storage medium," "servers," "resource manager device," "security device," and "web application." The specification confirms the conventional nature of these computer components and network.  *See, e.g.*, 609 Patent at 7:6-18 (describing conventional

communication networks), 7:19 ("conventional web browser"), 7:47-50 (disclosing storage as any of a myriad of known storage devices), 8:6-8 (describing "Security Layer" as a firewall), 8:10-12 (describing "Load Balancer Layer" as a layer that manages servers), 8:30-64 (describing generic servers).

While the AIV Patents purport to limit their scope to the storage of a "volume visualization data set" and the transmission of "frames" from that dataset, the specification plainly discloses this is just a particular type of data—images that may be transmitted as single frames (609 Patent at 9:43-46) or video streams (609 Patent at 9:53-54). The AIV Patents further admit that not only were volume visualization data sets known in the art, but it was also known that they "can be obtained via a client and server interaction over the web without having to retrieve raw scan on to user machines." 609 Patent at 2:17-21. Those prior methods also included means for transmitting the volume visualized data sets in a variety of ways, such as by sending low quality and high quality images. *See id.* (incorporating Engel publication).

### B.    Representative Claims

The Court need not address each individual claim when there are representative claims and "all the claims are 'substantially similar and linked to the same abstract idea.'" *Content Extraction & Transmission LLC v. Wells Fargo Bank Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014). Defendants contend that the 35

5

asserted claims (Complaint, D.I. 1 ¶¶ 84-123) may be grouped into three categories for purposes of the 101 analysis, with each group having a representative claim (highlighted in table).

| Group | Patent | Ind. Claim | Dep. Claim |
|-------|--------|------------|------------|
| 1 | 609 | 1 | 4, 6-9 |
| | 167 | 1 | |
| | 667 | 1 | 2, 3 |
| | 397 | 1, 13 | 2, 3, 11, 12, 14, 16-18 |
| 2 | 609 | | 19, 20 |
| | 167 | 6 | 7 |
| | 667 | | 8, 9 |
| 3 | 609 | 22 | 25, 26 |
| | 167 | 9 | 12, 13 |
| | 667 | 11 | 14, 15 |

**1.    Group 1: 609 claims 1, 4, 6-9; 167 claim 1; 667 claims 1-3; 397 claims 1-3, 11-14, 16-18**

The Group 1 claims are directed to storing data (a volume visualization dataset) at a remote server, retrieving the data, and displaying the data at a client device. Claim 1 of the 609 Patent is representative, and requires a system of generic components: "transmitter," "central data storage medium" containing a "centralized database," "plurality of servers in communication with the…centralized database," "a resource manager for load balancing the plurality of servers," "a security device controlling the plurality of communications," and "a web application." The web application is used "to satisfy a user's request" for the data, and performs the steps of accepting a user's request for data, determining if the requested data is stored

locally, and if not stored locally then requesting the data from the servers, receiving the data, and displaying the data.  609 Patent at 17:2-49.

> 2. **Group 2**: 609 claims 19, 20; 167 claims 6, 7; 667 claims 8, 9

The Group 2 claims include the use of a "unique identifiable key" to determine if requested data is stored locally.  Dependent claim 19 of the 609 Patent is representative.  In addition to including the limitations of claim 1, claim 19 requires "creating a unique identifiable key," "storing" the key on local storage, "comparing" the key to any prior requests, and "determining" if the key matches any prior requests.

> 3. **Group 3**: 609 claims 22, 25, 26; 167 claims 9, 12, 13; 667 claims 11, 14, 15

The Group 3 claims are similar to Group 1, except the Group 3 claims do not include the steps of checking whether requested data is stored locally.  Instead, the Group 3 claims require that low quality image data is transmitted before high quality image data.  Claim 22 of the 609 Patent is representative.  Claim 22 requires the same generic components as claim 1.  609 Patent at 19: 4-51.  The web application accepts a user's request for data, requests both low and high quality data, and the server transmits the low quality data before transmitting the high quality data.  *Id*.

## VI.   ARGUMENT

### A.   *Alice* Step 1: The Asserted Claims Are Directed To Abstract Ideas

#### 1.   Group 1

The Group 1 claims fail *Alice* step one because they are directed to the abstract idea of storing data remotely, retrieving the data if not available locally, and displaying the data.   As noted above, the claims recite generic computing components—transmitter, central data storage, servers, resource manager device, security device, and a web application.   609 Patent at 17:2-49.   And the web application is functionally claimed as accepting a user's request for data, checking if the data is stored locally, and if not, requesting the data from the servers, receiving the data, and displaying the data.   *Id.*

The problem, however, is that "[t]he Federal Circuit has established that the storage and retrieval of information is an abstract concept."   *SynKloud*, 490 F. Supp. 3d at 814 (collecting cases).   More specifically, and directly on point for this case, the Federal Circuit has confirmed that "[r]emotely accessing and retrieving user-specified information is an age-old practice that existed well before the advent of computers and the Internet."   *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017); *see also Content Extraction*, 776 F.3d at 1347 ("The concept of data collection, recognition, and storage is undisputedly well-known.   Indeed, humans have always performed these functions.").

The Group 1 claims are plainly directed to the patents' stated objective of "receiving, storing, processing and viewing large medical scans [i.e., data] via a web portal." 609 Patent at 2:61-62. The claims accomplish this using nothing more than generic computer components. This is insufficient to save the claims at step one. *Bozeman Fin. LLC v. FRB of Atlanta*, 955 F.3d 971, 979 (Fed. Cir. 2020) ("the use of well-known computer components to collect, analyze, and present data . . . does not render these claims any less abstract.").

Likewise, that the claims are directed to a particular type of data – "volume visualized data sets" – does not change that the claims are directed to abstract ideas. *Elec. Power Grp.*, 830 F.3d at 1353 ("[W]e have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.").

Plaintiff's own characterization of the alleged inventions in the Complaint confirms that they are directed to storing data remotely and retrieving the data. *See, e.g.*, Complaint, D.I. 1 ¶ 53 (alleging that the inventions relate "to viewing at a client computer a series of three-dimensional virtual views, transmitted over the Internet, of a volume visualization dataset contained on one more centralized databases."). Plaintiff attempts to recast their disclosures with the conclusory assertion that "each of the foregoing claims, when viewed as a whole, improves the technology and computer functionality of accessing and viewing medical imaging data." *Id.* ¶ 123.

9

However, Plaintiff provides no actual support for this statement, and the Court need not credit it. *Simio, LLC v. FlexSim Software Prods. Inc.*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6). . . A statement that a feature 'improves the functioning and operations of the computer' is, by itself, conclusory."); *Realtime*, 2021 U.S. Dist. LEXIS 158536, at *24 (disregarding conclusory statements). Rather than alleging any facts demonstrating how or why the claims are a purported improvement, the Complaint merely quotes broad swaths of the specification's "summary of the invention."

### 2. Groups 2 and 3

The Group 2 and 3 claims riff on the same underlying abstract idea as Group 1, and they too fail *Alice* step one for the same reasons. Specifically, Group 2, as shown in representative claim 19 of the 609 Patent, adds a "unique identifiable key" to be used along with the abstract idea of storing data remotely and retrieving the data. The "unique identifiable key," however is just like the "identifiers" determined to be abstract in *PersonalWeb*. There, the Federal Circuit likened a unique identifier to a call number:

> Librarians often locate books based on a 'call system' where they assign books unique identifiers based on call numbers, which change dependent on a book's volume, etc. Such content-based identifiers may be used to control access to books (e.g., authorize borrowing depending on book content), retrieve books (e.g., locate books on shelves based on their content) . . .The claims do this in a computer environment, but that doesn't transfigure an idea out of the realm of abstraction.

10

*PersonalWeb*, 8 F.4th at 1316.  Just like a call number, the "unique identifiable key" in Claim 19 is used to retrieve data, either located locally (like on the main library shelves) or from remote storage (in the library basement).   Claim 19 requires "creating" the unique key and "comparing" and "determining" if the values of the key match – just like the claims found abstract in *PersonalWeb*. *Id.* at 1316-17 (steps of "generating" identifiers and "comparing the content-based identifier against other values" are also abstract); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1313 (Fed. Cir. 2016) (abstract idea included steps of receiving identifiers and "determining [] whether each received content identifier matches a characteristic of other identifiers."); *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) ("The fact that an identifier can be used to make a process more efficient . . . does not necessarily render an abstract idea less abstract.").[1]

Group 3, as shown in representative claim 22 of the 609 Patent, is likewise directed to the abstract idea of storing data remotely, retrieving the data, and

---

[1] Further, the claims do not describe *how* to create the unique identifiable key. Rather, claim 19 merely includes a step of "creating a unique identifiable key of a request by the remote location of a three-dimensional virtual view of the volume visualization dataset."  Just asserting that the claims achieve a result without any details on how to implement it is a hallmark of abstract ideas.  *See Affinity Labs of Tex. LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016).

displaying the data.  The mere variation of transmitting low quality data before high quality data found in the Group 3 claims does not alter the conclusion.  The specification explains that sending low quality images first allows the user to "interact with the partially and progressively loaded volume" while the higher quality images are loading – thereby reducing user downtime.  609 Patent at 10:65-11:6.  At best, the transmission of low quality data before high quality data constitutes a more efficient user experience, not a technical solution.  *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1090 (Fed. Cir. 2019) ("This invention makes the [user] faster and more efficient, not the computer.  This is not a technical solution to a technical problem.").  Moreover, the claims do not identify a particular improvement in *how* the low quality or high quality data is transmitted with computer technology.  The patents describe nothing more than generic operation of computers in storing and transmitting data in a particular order.  *See Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 607 (D. Del. 2017) (claims ineligible where they relied "on the ordinary storage and transmission capabilities of computers within a network and apply that ordinary functionality in a particular context").

### B.  *Alice* Step 2: The Claims Lack An Inventive Concept

Whether considered individually or as an ordered combination, the claim elements of the AIV Patents do not add an "inventive concept" to "transform" the claimed abstract idea into patent-eligible subject matter.  *Alice*, 573 U.S. at 221.

### 1.  The Claimed Components Are Generic

The claimed components are all generic computer components, which the specification itself confirms, and courts have held, are conventional.

Storage mediums and servers – the specification explains, for example, that a storage medium can "be any tangible medium that can contain, or store a program for use by or in connection with an instruction execution system, apparatus, or device." 609 Patent at 7:47-50.  In other words, the storage medium can be anything capable of storage.  The disclosed servers are similarly conventional.  609 Patent at 8:30-64.  These are "generic components, used in their ordinary capacity" and do not supply inventive concept.  *See, e.g.*, *SynKloud Techs.*, 490 F. Supp. 3d at 818 (addressing "storage server" comprised "of generic components" such as "hard disk drives" and "memory" in finding no inventive concept).

Communications networks – the specification likewise acknowledges the use of generic communication systems, which may be "wireless, wireline, optical fiber cable, radio frequency (RF) or the like, and may also be made via an internal network (LAN), wide area network (WAN) and/or over the Internet." 609 Patent at 7:8-11.

13

Courts have routinely determined that the use of a computer network does not confer eligibility. *See, e.g., buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014) ("[T]he use of the Internet is not sufficient to save otherwise abstract claims from ineligibility under §101."); *see also SynKloud*, 490 F. Supp. 3d at 814 ("communication medium" is a "generic computer element").

Client device and web application – the specification confirms that "[t]he customer or user uses an otherwise conventional web browser application 32 on a computer or other electronic device 22 at a remote location capable of communicating across an intranet or the Internet." 609 Patent at 7:19-22. The claims merely recite that the web application perform the abstract ideas of accepting a user request, checking if data is stored locally, and if not, requesting data from a server, and displaying the data. But simply reciting that the abstract ideas are performed using a computer web application is not an inventive concept. *Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1370-1371 (Fed. Cir. 2015) ("Steps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent-eligibility.").

14

<u>Resource manager device and security device</u> – The specification likewise discloses that these are generic, black-box, computer components that perform routine functions.  The patent states that the "resource manager device" merely performs the generic function of "manag[ing] the allocation and expansion of servers."  609 Patent at 8:1-14.  Likewise, the specification merely describes the "Security Layer" as "consist[ing] of one or many firewall(s) 76, intrusion detection system(s) 72, and intrusion prevention systems(s) 74."  *Id*. at 8:6-8.  No technical improvements are described for these generic components, and the claims are equally generic in reciting these components.  *See e.g.*, 609 Patent at 17:16-20.

Further, the functions performed by these generic computer components— storing, retrieving and displaying data—are among the most routine functions of generic computers.  *See Mortg. Grader, Inc. v. First Choice Loan Servs*., 811 F.3d 1318, 1324-25 (Fed. Cir. 2016) (no inventive concept in claims reciting "stor[ing]" and "display[ing]" data); *Interval Licensing LLC v. AOL, Inc*., 896 F.3d 1335, 1347 (Fed. Cir. 2018) ("[Plaintiff] does not, and cannot, contend that it is arguably inventive to enable a person to access information over a network through a user interface."); *In re TLI*, 823 F.3d at 612 (servers "storing, receiving, and extracting data" were routine computer functions).

15

### 2.     The Claimed Concepts Are Well-Known, Routine And Conventional

First, with respect to Group 1, representative claim 1 of the 609 Patent recites a system of generic components for remotely storing a "volume visualization dataset" and client-server interaction for accessing frames of the dataset using a web application on the client device.  The specification, however, states that a 1999 "publication by Klaus Engel on Remote 3D Visualization Using Image-Streaming Techniques teaches how volume visualization [data] can be obtained via a client and server interaction over the web without having to retrieve raw scan on user machines."  609 Patent at 2:16-21; *see also* Ex. 5 (illustrating and describing a central storage for a volume visualization dataset, and a client-server architecture for accessing the dataset).[2]  Thus, the specification readily admits that a client-server interaction for accessing a centrally stored volume visualization dataset is ***not*** an inventive concept.

Claim 1 of the 609 Patent also functionally claims the web application performing the steps of accepting a user's request for data, checking if the data is stored locally, and if not, requesting the data from the servers, receiving the data, and displaying the data.  609 Patent at 17:24-49.  In the context of a web application,

---

[2] Defendants request judicial notice of Exhibits 5-7, as set forth in their accompanying motion.

16

this is the well-known, routine and conventional concept of caching. Indeed, Plaintiff boldly accuses the concept of caching of infringement. *See, e.g.*, Complaint, D.I. 1 ¶ 139-141. This District has previously observed that caching is another generic computer function. *TrackTime, LLC v. Amazon.com, Inc.*, C.A. No. 18-1518-MN, 2019 U.S. Dist. LEXIS 102375, at *10 (D. Del. June 19, 2019) (in finding claims directed to abstract idea, noting that dependent claims "simply add generic computer functions, for example, seeking a multimedia file or caching"). Such an abstract idea can be even further distilled using the library example addressed above. The concept is simply checking the local library shelves before determining whether a book needs to be secured from a different offsite location. It is not inventive to perform that concept with computers.

Indeed, that caching is well-known, routine and conventional is further confirmed by the specification, which repeatedly references conventional web browsers and the hypertext transfer protocol (HTTP). *See, e.g.*, 609 Patent at 7:19-20. Likewise, the specification references the use of a web browser's caching mechanism in delivering frames (i.e., data). 609 Patent at 13:10-13 ("Where a web application is written in scripting language such as JavaScript, the recollection of rendered frames may be done by utilizing the web browser's caching mechanism."). Caching is a well-known concept dating back to the early days of the Internet,

necessarily incorporated in web browsers using HTTP. *See, e.g.*, Ex. 6 (RFC 2616) at 47.

Second, the Group 2 claims are nothing more than an attempt to claim the abstract idea itself. As addressed above, the claim's computer components are all generic, and merely used to implement the abstract idea of using a unique identifiable key to determine if data is stored locally. But the Federal Circuit has made abundantly clear that the inventive feature in a patent cannot be the abstract idea itself. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73 (2012) (explaining the inventive concept must be "significantly more" than the abstract idea itself); *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept"). Further still, the Federal Circuit has confirmed the use of a unique identifier – such as the sender generated identifier in *Secured Mail* or the content based identifier in *PersonalWeb* – is not inventive. *Secured Mail,* 873 F.3d at 912 ("The district court is correct that the sender-generated identifier is not a sufficiently inventive concept."); *PersonalWeb*, 8 F.4th at 1318 (claims reciting use of "content-based identifier" "just restate the abstract ideas"). Not surprisingly, and as confirmed by the excerpt below from a 1997 textbook on computer data structures and algorithms, it is beyond debate that the

concept of using a unique identifiable key to determine if data is present in storage

is well-known, routine and conventional:

> Organizing and retrieving information is at the heart of most computer applications, and searching is surely the most frequently performed of all computing tasks. Search can be viewed abstractly as a process to determine if an element with a particular value is a member of a particular set. The more common view of searching is an attempt to find the record within a sequence of records that has a particular key value, or those records in a sequence whose key values meet some criteria such as falling within a range of values.
>
> We can define searching formally as follows.
>
> **Definition 10.1** Suppose $k_1, k_2, \ldots k_n$ are distinct keys, and that we have a collection $T$ of $n$ records of the form
>
> $$(k_1, I_1), (k_2, I_2), \ldots, (k_n, I_n),$$
>
> where $I_j$ is information associated with key $k_j$ for $1 \leq j \leq n$. Given a particular key value $K$, the **search problem** is to locate the record $(k_j, I_j)$ in $T$ such that $k_j = K$. **Searching** is a systematic method for locating the record (or records) with key value $k_j = K$.
>
> A **successful** search is one in which a record with key $k_j = K$ is found. An **unsuccessful** search is one in which no record with $k_j = K$ is found (and presumably no such record exists).
>
> An **exact-match query** is a search for the record whose key value matches a specified key value. A **range query** is a search for all records whose key value falls within a specified range of key values.

Ex. 7 at 4.

Finally, the Group 3 claims suffer the same problems. The only addition to

the generic components in the Group 3 claims, as shown by representative claim 22

of the 609 Patent, is the idea of transmitting low quality data then high quality data.

But the specification identifies the 1999 publication by Engel, which specifically

discloses the idea of "two layer spatio-temporal pyramid" which allows the image

data to be "decomposed into a low quality and high quality layer." Ex. 5 at 2. The

Engel paper further explains that this two layer pyramid is based on a publication from 1991 – *nineteen years* before the first AIV Patent application was filed.  *Id*. Thus, like caching with the Group 1 claims, and using a unique identifiable key to search for data with the Group 2 claims, the concept of sending low then high quality data is clearly not an inventive concept as shown by publications that are referenced in the specification itself.

But even setting aside that the Engel paper referenced in the specification demonstrates that the concept of transmitting low then high quality data is not inventive, the claims merely recite the idea itself.  *BSG Tech*, 899 F.3d at 1290 ("a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept").  Indeed, nothing in the claims recites any technical solution regarding the transmission of low or high quality image data.  Instead, the claims merely recite the bare concept of transmitting the low quality data first, then transmitting the high quality data.  This is insufficient to transform the nature of the claim into a patent-eligible application.  *See Realtime*, 2021 U.S. Dist. LEXIS 158536, at *25 ("results-based claims [that] describe desirable outcomes and functionality, but do not offer ways to achieve these results" were ineligible); *see also Affinity Labs*, 838 F.3d at 1269 ("At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.").

20

### C.    Nothing in the Dependent Claims Supplies An Inventive Concept

The dependent claims do not save the AIV Patents.  These claims merely add non-inventive limitations that, for example, require conventional operations or limit the type of data that is transmitted.  *See Realtime Data LLC v. Array Networks Inc.*, C.A. No. 17-0800-CFC, 2021 U.S. Dist. LEXIS 84699, at *21 (D. Del. May 4, 2021) (dependent claims did not impact 101 determination where they "merely specify additional steps of abstract data analysis or limit the claims to particular operations.").  All of the asserted dependent claims are addressed below.

First, the dependent claims merely require conventional steps such as authentication using the web application (609 claims 4, 7-8; 667 claims 2-3; 397 claims 2-3), viewing data via a web application (609 claim 9), storing data on a local device (397 claim 14), or displaying low quality data before high quality data (397 claim 16).  But "[c]ontrolling access to data items [] is abstract, as '[c]ontrolling access to resources is exactly the sort of process that can be performed in the human mind.'" *PersonalWeb*, 8 F.4th at 1317.  And there is no inventive concept in displaying and storing data.  *See Mortgage Grader*, 811 F.3d at 1324-25.

Second, other dependent claims simply state that the web application is for "diagnostic imaging viewing purpose" (609 claim 6), or recite that the data is transmitted as a "compressed video stream" or "as one or more single frames" (609 claims 25-26; 167 claims 12-13; 667 claims 14-15; 397 claims 11, 17).  Limiting the

application to a particular field of use or type of data is not transformative.  *See e.g.*, *Elec. Power*, 830 F.3d at 1353.

Third, 397 claims 12 and 18 require that "genetic algorithms, self-organizing maps, neural networks, or other machine learning algorithms are applied during processing."  This is just another iteration of applying one abstract idea to another. *Realtime*, 2021 U.S. Dist. LEXIS 158536 at *16 ("[a] process that start[s] with data, add[s] an algorithm, and end[s] with a new form of data [is] directed to an abstract idea.").

Fourth, 609 claim 20, 167 claim 7, and 667 claim 9 require "associat[ing] the unique identifiable key of a prior request by the client device of a virtual view with a stored frame of the prior request of the virtual view."  As already described above, associating a unique key with a piece of data for purposes of organizing and retrieving data is well-known, routine and conventional.

Finally, dependent claim 8 of the 667 patent is identical to representative claim 19 of the 609 patent, which has already been addressed.

## VII.   THE REQUEST FOR A FINDING OF WILLFULNESS SHOULD BE DISMISSED

To the extent the Court declines to invalidate the AIV Patents, the request for a finding of willfulness and enhanced damages should be dismissed.

Plaintiff's request is simply thrown into its Prayer for Relief. The Complaint is devoid of any facts alleging that Defendants' infringement has been willful.[3]  The Complaint does not even allege that Defendants were aware of the AIV Patents prior to the filing of the lawsuit.  A failure to allege pre-suit knowledge is insufficient to state a claim for enhanced damages in this Court.  *ZapFraud, Inc. v. Barracuda Networks, Inc.*, 528 F. Supp. 3d 247, 252 (D. Del. 2021).

## VIII. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

---

[3] Defendants requested Plaintiff dismiss its willfulness claim on December 20, 2021.  Plaintiff refused.  Ex. 8.

OF COUNSEL:

David J. Lender
Anish R. Desai
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000

Amanda Branch
WEIL GOTSHAL & MANGES, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Tel:  (650) 802-3000

David Greenbaum
NUANCE COMMUNICATIONS, INC.
1111 Macarthur Blvd.
Mahwah, NJ 07430
Tel: (201) 252-9100

*Attorneys for Defendant Nuance
Communications Inc.*

David M. Pocius
Michael J. Wasco
PAUL FRANK + COLLINS P.C.
One Church Street
Burlington, VT 05402
Tel: (802) 658-2311

*Attorneys for Defendant Mach7
Technologies, Inc.*

Dated:  December 27, 2021
7533705 / 52391

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com

*Attorneys for Defendants Nuance
Communications Inc. and Mach7
Technologies, Inc.*