## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AI VISUALIZE, INC.

     Plaintiff,

     v.

NUANCE COMMUNICATIONS INC. and
MACH7 TECHNOLOGIES, INC.,

     Defendants.

C.A. No. 1:21-cv-01458-CFC

**JURY TRIAL DEMANDED**

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Of Counsel:

Sean N. Hsu (*pro hac vice*)
Rajkumar Vinnakota (*pro hac vice*)
Gary Sorden (*pro hac vice*)
Vishal Patel (*pro hac vice*)
COLE SCHOTZ P.C.
901 Main St., Suite 4120
Dallas, TX 75202
(469) 557-9390
shsu@coleschotz.com
kvinnakota@coleschotz.com
gsorden@coleschotz.com
vpatel@coleschotz.com

**COLE SCHOTZ P.C.**
Andrew L. Cole (No. 5712)
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801
(302) 652-3131 (Phone)
acole@coleschotz.com

*Attorneys for Plaintiff,*
*AI Visualize, Inc.*

## TABLE OF CONTENTS

Page

I.     NATURE AND STAGE OF PROCEEDINGS.................................................1

II.    SUMMARY OF THE ARGUMENT ........................................................1

III.   BACKGROUND .................................................................................2

IV.    ARGUMENT......................................................................................4

       A.    LEGAL STANDARDS..................................................................4

       B.    REPRESENTATIVE CLAIMS ........................................................5

       C.    ANALYSIS AND ARGUMENT .......................................................6

             1.    *Alice/Mayo* – Step 1 .....................................................6

                   a.    Group 1 claims ..................................................6

                   b.    Group 2 claims ..................................................9

                   c.    Group 3 claims ................................................11

             2.    *Alice/Mayo* – Step 2 ...................................................13

                   a.    Group 1 claims ................................................13

                   b.    Group 2 claims ................................................16

                   c.    Group 3 claims ................................................18

       D.    ALLEGATIONS REGARDING WILLFULNESS ............................19

V.     CONCLUSION...............................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
134 S.Ct. 2347 (2014)....................................................................*passim*

*Berkeimer v. HP Inc.*,
881 F. 3d 1360 (Fed. Cir. 2018) ......................................................14

*Cosmokey Sols. GMBH & Co. v. Duo Security LLC*,
15 F.4th 1091 (Fed. Cir. 2021) ........................................................6

*Elmer v. Tenneco Resins, Inc.*,
698 F. Supp. 535 (D. Del. 1988).....................................................20

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ................................................8, 9, 12

*Intellectual Ventures I LL v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016) .......................................................17

*McRo, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ...................................................9, 10

*Mentone Sols. LLC v. Digi Int'l. Inc.*,
No. 2021-1202, 2021-1203, 2021 WL 5291802
(Fed. Cir. Nov. 15, 2021)......................................................6, 9, 12

*Realtime Data LLC v. Array Networks Inc.*,
No. 1:17-cv-00800-CFC, 2021 WL 3726013
(D. Del. Aug. 23, 2021) .......................................................4, 15

**Statutes**

35 U.S.C. §101 ............................................................................1

## I.    NATURE AND STAGE OF PROCEEDINGS

Plaintiff AI Visualize, Inc. ("Plaintiff") filed its Complaint against Defendants Nuance Communications Inc. and Mach7 Technologies, Inc. (collectively the "Defendants") on October 15, 2021, asserting claims for patent infringement.  [D.I. 1].   Defendants responded to the Complaint by filing a Motion to Dismiss on December 27, 2021.  [D.I. 14].  Plaintiff amended its Complaint on January 11, 2022. [D.I. 22] (the "Amended Complaint").   Defendants responded to the Amended Complaint with a renewed motion to dismiss [D.I. 24], and on January 25, 2022, filed their brief in support [D.I. 25].   This is Plaintiff's brief in opposition to Defendants' motion to dismiss the Amended Complaint (the "Response").

## II.    SUMMARY OF THE ARGUMENT

The asserted claims of the patents-in-suit recite patent eligible subject matter in accordance with 35 U.S.C. §101.  None of the asserted claims are directed to abstract ideas, and, at a minimum, all of the asserted claims contain inventive concepts rendering the asserted claims patent eligible.   Defendants improperly oversimplify and omit/misstate various limitations of the asserted claims to support their contentions to the contrary.  Defendants' analysis begins from their refrain that the patents are directed to (1) storing data remotely, (2) retrieving the data, and (3) displaying the data.  But as discussed below, Plaintiff's patents instead create a ***virtual view*** of the stored data to correspond with a user's request.  This virtual view

is not part of the remotely stored dataset—instead, it is dynamically generated on the fly by the remote server based on the spontaneous requests of the user at the time and therefore would be newly generated in real-time. Thus, the virtual view is not being retrieved from the remotely stored data and displayed as Defendants argue.

As a result, Defendants' §101 analysis necessarily fails because their description of the alleged abstract concept mischaracterizes the claimed invention at issue. When viewed correctly, however, the asserted claims comply with §101, and Defendants' motion should be denied.

## III.   BACKGROUND

The asserted claims of the patents-in-suit are directed to methods and systems for fast access to visualization of medical scans using a dedicated web portal. *See e.g.,* D.I. 22-3 at Title.[1]  Medical scans, such as Computed Axial Tomography (CT) scans and magnetic resonance imaging (MRI) scans result in voluminous datasets of two-dimensional scans that are time consuming to transport over the Internet. *See* D.I. 22 at ¶20; '609 Pat. at Col. 1:27-30. Generating three-dimensional views of the two-dimensional scan data required powerful computers and direct access to the raw scan data. *Id.* at ¶34; '609 Pat. at 1:47-53. For example, with large medical scans,

---

[1] The patents-in-suit include U.S. Pat. Nos. 8,701,167; 9,106,609; 9,438,667; and 10,930,397. The patents-in-suit are related and share a substantially similar specification. For ease of reference, this Brief cites to the '609 Patent.

conventional systems required the raw scan data to reside on the user's computer to allow a user to request arbitrary and dynamically generated views that could be manipulated. *Id* at ¶30; '609 Pat. at 2:6-9. Retrieving large three dimensional, four-dimensional, or higher dimensional scan data for processing was impractical or impossible over low bandwidth networks. *Id* at ¶32; '609 Pat. at 2:9-16. While one author has described a mechanism for obtaining volume visualization via a client and server interaction over the web, such a technique required sufficient bandwidth and low latency networks and was impractical for use in all situations. *Id.* at ¶37; '609 Pat. at 2:17-25.

The patents-in-suit provide solutions to the problem of processing and transmitting large volumes of data over the Internet that overcome the low bandwidth and high latency limitations inherent in the standard Internet. *See Id.* at ¶56; '609 Pat. at Col. 1:25 – 2:3; 2:35-42. Another benefit of the claimed inventions is a reduction of costs associated with conventional systems. *See e.g., id.* at ¶34; '609 Pat. at Col. 1:56-58.

The patents-in-suit improve the functionality of conventional systems by, among other things, centralizing the storage of large, two-dimensional scan data, or volume visualization datasets. *Id.* at ¶57; '609 Pat. at Col. 2:52-61. The claimed systems also provide one or more servers in communication with the centralized storage to process the volume visualization datasets and to create three dimensional

3

virtual views based on client requests. *Id.*; '609 Pat. at Col. 2:61-64.  Each virtual view, importantly, is comprised of individual view frames.  *See e.g., id.* at ¶64; '609 Pat. at Col. 3:53-63; 4:12-15.  Some of the view frames making up the virtual view are stored locally at the client while other frames of the virtual view are created in response to a client request for the virtual view.  *Id.* at ¶¶62-64; '609 Pat. at Col. 3:53-66.  The created view frames are transmitted to the client and the virtual view is displayed to the user by sequentially displaying view frames from the server along with frames stored locally at the client.  *Id.*; '609 Pat. at Col. 3:66-67; Col. 4:15-20.

Another aspect of the invention is that the individual view frames are requested and created at both lower and higher image qualities.  *Id.* at ¶68; '609 Pat. at 5:4-18.

## IV.   ARGUMENT

### A.   LEGAL STANDARDS

Plaintiff recognizes that the Court is aware of the relevant legal standards governing the determination of subject matter eligibility for patent claims on a motion to dismiss, for example, these are set forth in its opinion in *Realtime Data LLC v. Array Networks Inc*. *See* No. 1:17-cv-00800-CFC, 2021 WL 3726013 at *4 (D. Del. Aug. 23, 2021).  The principles described in *Realtime*, as well as in other legal authority, are applied and cited in the arguments set forth below.

**B.    REPRESENTATIVE CLAIMS**

Plaintiff agrees that the asserted claims may be grouped into the three categories identified by Defendants for purposes of this analysis.[2]  Defendants' characterizations of the asserted claims, however, are incorrect and omit/misstate various elements of the inventions.  In particular, all of Defendants' analysis begins from their refrain that the patents are directed to (1) storing data remotely, (2) retrieving the data, and (3) displaying the data.  Dkt. 24 at 4-7, 10-11.

However, Plaintiff's patents create a ***virtual view*** containing virtual frames that generate one perspective visualization of the stored data to correspond with a user's commands and/or requests at that moment.  *See*, *e.g.*, D.I. 22 at ¶¶57, 62-64; '609 Pat. at Col. 2:61-64, 3:53-67, 4:12-20.  Contrary to Defendants' entire analysis, this created virtual view is not a prestored part of the remote dataset that merely needs to be retrieved from stored data and displayed.  Instead, it is generated dynamically on the fly by the remote server based on the spontaneous requests of the user at the time and therefore would be new information generated in real-time.

---

[2] As used herein, "Group 1" refers to claims: 1 of the '167 Patent; 1, 4, and 6-9 of the '609 Patent; 1-3 of the '667 Patent;  and 1-3, 11-14, and 16-18 of the '397 Patent.  "Group 2" refers to clams: 6 and 7 from the '167 Patent; 19 and 20 from the '609 Patent; and 8 and 9 from the '667 Patent. "Group 3" refers to claims 9, 12 and 13 from the '167 Patent; 22, 25 and 26 from the '609 Patent; and 11, 14 and 15 from the '667 Patent.

As a result, Defendants' §101 analysis necessarily fails because their description of the alleged abstract concept mischaracterizes the actual invention at issue.  As set forth below, the asserted claims are directed to patentable subject matter.

### C.   ANALYSIS AND ARGUMENT

#### 1.   *Alice/Mayo* – **Step 1**

Whether claims are directed to patentable subject matter requires first determining whether the claims at issue are directed to a patent-ineligible concept. *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014).  Under this first step, courts consider what the patent asserts to be the focus of the claimed advance over the prior art.  *Cosmokey Sols. GMBH & Co. v. Duo Security LLC*, 15 F.4th 1091, 1097 (Fed. Cir. 2021).  The Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself.  *Mentone Sols. LLC v. Digi Int'l. Inc.*, No. 2021-1202, 2021-1203, 2021 WL 5291802 at *3 (Fed. Cir. Nov. 15, 2021) *citing Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020).

#### a.   **Group 1 claims**

The Group 1 inventions improve computer networks' ability to process, transmit and display large volume datasets over the Internet. Claim 1 of the '609 Patent is illustrative.  It is directed to a "system for viewing at a client device at a

remote location a series of three-dimensional virtual views over the Internet of a volume visualization dataset contained on at least one centralized database." '609 Pat. at Col. 17:2-5.  In addition to elements directed to centralized and client infrastructure, claim 1 requires: (1) a "series of [virtual] views comprising a plurality of separate view frames;" (2) "a local data storage medium for storing frames of views of the volume visualization dataset;" (3) "determining if any frame of the requested views of the volume visualization dataset is stored on the local data storage medium;" (4) "request for any frame of the requested views not stored on the local data storage medium;" (5) creating, transmitting, and receiving any frame not stored on the local data storage medium; and (6) "displaying to the user at the remote location the requested series of three-dimensional virtual views of the volume visualization dataset by sequentially displaying frames transmitted from at least one of the servers along with any frames of the requested series of views stored on the local data storage medium." *Id.* at Col. 17:6-49.

By requiring the virtual views to be comprised of a plurality of separate view frames, storing some view frames locally and only creating those frames not stored locally, and sequentially displaying the local frames along with the newly created frames, the asserted claims improve the functionality of previously known systems. For example, the claimed inventions provide for "a processing and access mechanism that overcomes low bandwidth and high latency limitations that are

inherent properties of the standard Internet." *See e.g., id.* at Col. 16:26-32. Additionally, by determining whether view frames responsive to a current client request are available locally avoids a request to the server to create that frame. *See id.* at Col. 13:20-22. The specification further touts the advantages over the prior art, for example, "[b]y keeping track of user interaction sequences and its corresponding rendered frames, bandwidth usage and server resources may be sufficiently enhanced so that the interactive performance of applications in low bandwidth conditions is possible." *Id.* at Col. 13:23-26. The specification also states that "[k]eeping track of user interaction sequences and its corresponding rendered frames also enables the display of 4D or higher dimensional dataset at interactive frame rates over low bandwidth." *Id.* at Col.13:52-55. These advantages improve the functionality of prior computer systems on which it was "impractical or impossible" to retrieve and process large volume datasets over standard Internet. *See e.g.,* D.I. 22 at ¶¶31-32; '609 Pat. at Col. 2:9-17.

The claims at issue here are much like those analyzed in *Enfish. See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016) (analyzing claim directed to "a data storage and retrieval system for a computer memory."). There, the Federal Circuit determined "the self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory." *Id* at 1339. And the court held that the claims

were patent eligible under step one because the claims were "directed to a specific implementation of a solution to a problem in the software arts." *Id.* Similarly, here, the Group 1 claims are directed to specific implementation for improving prior art computer networks by allowing them to operate on "any Internet connection." *See e.g.,* '609 Pat. at Col. 16:26-32. Because the Group 1 claims are directed to improvements to the functionality of a computer network, the claims recite patent eligible subject matter under step one of the *Alice* test. *See e.g., Mentone*, 2021 WL 5291802 at *3; *Enfish*, 822 F.3d at 1336.

Defendants' arguments to the contrary are based on an improper analysis of the Group 1 claims. Defendants omit the elements described above and greatly oversimplify the Group 1 claims to the point where the inventive concept has been removed. The Court should reject this flawed analysis and deny Defendants' Motion as to the Group 1 claims. *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed. Cir. 2016) ("We have previously cautioned that courts must be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") *internal quotations omitted*.

### b.    Group 2 claims

The Group 2 claims require the same limitations as the Group 1 claims and are therefore also patent eligible under step one of the *Alice* test. Defendants' failure to address these specific limitations of the Group 2 claims, along with their failure

9

to analyze the claims as a whole, are fatal and Defendants' arguments should be rejected. *McRo*, 837 F.3d at 1313.

Additionally, the Group 2 claims further define a specific implementation for determining which locally stored frames relate to a requested three-dimensional virtual view. Claim 19 of the '609 Patent is illustrative and requires, among other things: (1) creating a unique identifiable key of a request for a three-dimensional virtual view; (2) storing the unique identifiable keys of prior requests for three-dimensional virtual views locally; (3) comparing the unique key of a current request to the unique key of prior requests; (4) if the value of a key for the current request is equivalent to a prior request, the system displays a frame stored locally associated with the prior request; and if the value is not equivalent to a key from a prior request, displaying a frame generated and transmitted by the server. *See* '609 Pat. at Col. 18:42-60. The Group 2 claims go beyond just claiming functional results.

Rather, the Group 2 claims are directed to a specific improvement to computer functionality, namely, *how* the computer determines whether a locally saved view frame relates to a current client request. The specification confirms that the claimed mechanism provides an improvement over the prior art. Specifically, the specification states, "[b]y keeping track of user interactions parameters and the corresponding locally stored frames, and by having a rapid way to identify the current user interaction with previous interaction parameters, as well as

10

automatically pre-fetching of interaction sequences, the present invention is able to achieve interactivity over low bandwidth and high latency networks." *Id*. at Col. 13:45-50.   The specification also states that "[k]eeping track of user interaction sequences and its corresponding rendered frames also enables the display of 4D or higher dimensional dataset at interactive frame rates over low bandwidth." *Id.* at Col.13:52-55.   Both tasks were previously impractical or impossible on prior art systems. *See* D.I. 22 at ¶¶31-32.

### c.   Group 3 claims

Like Groups 1 and 2, the Group 3 claims require "the plurality of virtual views comprising a plurality of separate view frames." *See e.g.,* '609 Pat.  at Col. 19:28-31.   The Group 3 claims, of which claim 22 of the '609 Patent is illustrative, further require the user's request for a plurality of three-dimensional virtual views to include "a request for a lower image quality parameter for the frames, at a lower frame resolution, and a request for a higher image quality parameter for the frames, at a higher frame resolution." *Id.* at Col. 19:31-35.   The specification explains that "[a] lower image quality parameter for the frames may be transmitted over the Internet from the server [] to the user device [] at a faster rate than a high image quality parameter for the frames." *Id.* at Col. 10:43-46.   "These options allow one to use a lower quality image to facilitate delivery of high frame rates and once interaction is stopped, an image quality with highest fidelity may be restored." *Id.* at Col. 10:58-

11

61. Accordingly, the inventions claimed by the patents-in-suit can provide and display three dimensional virtual views even over low bandwidth connections by creating different image quality frames that make up the virtual view. By providing requests for both lower and higher image quality parameter for the frames—and creating and transmitting the lower and higher image quality parameter frames—the claimed systems improve prior art systems that were previously unable to operate "on any Internet connection." *Id.* at Col. 16:26-32. Like the Group 1 and 2 claims, the Group 3 claims are directed to an improvement in the functionality of prior art systems, and are therefore patent eligible. *See e.g., Mentone*, 2021 WL 5291802 at *3; *Enfish*, 822 F.3d at 1336.

Like with the Group 1 claims, Defendants omit key limitations and oversimplify the Group 3 claims in their analysis. Further, Defendants fail to recognize the teachings of the patents-in-suit, *i.e.* that the provision of three-dimensional views was impractical or impossible in prior art computer networks. *See* '609 Pat. at Col. 2:9-12; Col. 2:21-25. While the Group 3 claims may also provide a more efficient user experience as admitted by Defendants, the claims are directed to improvements to prior art systems that allow computer systems to now function on "any Internet connection." *Id.* at Col. 16:26-32.

12

## 2.     *Alice/Mayo* – Step 2

Assuming *arguendo* that the asserted claims are directed to an abstract idea—they are not—each claim recites an inventive concept that transforms the nature of the claim into patent-eligible subject matter.  *Alice,* 134 S. Ct. at 2355.  Defendants contend that the asserted claims are directed to the abstract idea of storing data remotely, retrieving the data if not available locally, and displaying the data.  *See* D.I. 15 at 8.  As described above, the asserted claims include more.

### a.     Group 1 claims

As described above, the Group 1 claims require, among other things: (1) "series of [virtual] views comprising a plurality of separate view frames;" (2) "a local data storage medium for storing frames of views of the volume visualization dataset;" (3) "determining if any frame of the requested views of the volume visualization dataset is stored on the local data storage medium;" (4) "request for any frame of the requested views not stored on the local data storage medium;" (5) creating, transmitting, and receiving any frame not stored on the local data storage medium; and (6) "displaying to the user at the remote location the requested series of three-dimensional virtual views of the volume visualization dataset by sequentially displaying frames transmitted from at least one of the servers along with any frames of the requested series of views stored on the local data storage medium." '609 Pat. at Col. 17:6-49.  These requirements are neither generic nor conventional.

Further, these elements provide for the improvements over the prior art described by the specification. *See e.g., id.* at Col. 13:23-27; 16:26-32.

Step two of the *Alice* test requires considering the claim's elements, both individually and as an ordered combination, to determine whether an inventive step is present. *Alice*, 134 S. Ct. at 2350. Defendants fail to do so. Instead they focus only on two concepts. First, Defendants argue that the publication by Klaus Engel identified in the specification of the patents-in-suit renders the concept of obtaining a volume visualization via a client and server interaction over the Internet conventional. *See* D.I. 15 at 16. Defendants are incorrect, and notably the patents issued despite Plaintiff's citation to Klaus. Plaintiff also objects to Defendants' attempts to introduce materials extrinsic to the Amended Complaint for the improper purpose of soliciting substantive adverse inferences against Plaintiff at the pleading stage and prior to any fact or expert discovery. Plaintiff's objections to Defendants' request for judicial notice of Exhibits 5, 6, and 7 (and reliance thereto for this motion to dismiss) are further stated in Plaintiff's concurrently-filed opposition to Defendants' separate motion requesting judicial notice of those exhibits.

Additionally, the mere fact that something is disclosed in a piece of prior art does not mean it was well-understood, routine and conventional. *Berkeimer v. HP Inc.*, 881 F. 3d 1360, 1369 (Fed. Cir. 2018). For example, the specification expressly states that user requests for arbitrarily and dynamically generated views "normally

14

mandates that the raw scan data needs to be present on the user's computer for manipulation." *See e.g.,* D.I. 22 at ¶30; '609 Pat. at Col. 2:6-9.  Even if the Klaus method were conventional—which it is not—the specification expressly states that such a method was inoperable in low bandwidth and high latency networks.  '609 Pat. at Col. 2:21-23.  At a minimum, there is a dispute whether the concept of obtaining a volume visualization via a client and server interaction over the Internet was conventional, and therefore Defendants' motion should be denied.  *Realtime Data LLC*, 2021 WL 3726013 at *4 ("a court must accept as true all factual allegations in the complaint and in documents explicitly relied upon in the complaint, and it must view those facts in the light most favorable to the plaintiff.").

Defendants further fail to analyze the claim elements as an ordered combination.  There is no evidence that suggests the elements of: (1) a virtual view— or any data type—comprised of a plurality of separate frames; (2) storing some frames locally; (3) creating necessary frames that are not stored locally in response to a client request; and (4) displaying the virtual view to the user by sequentially displaying the newly generated frames along with those frames stored locally are well-known, routine, or conventional.  Defendants omit or greatly oversimplify these elements in an effort to equate the claims to caching and to try to further their analogy of "checking the local library shelves before determining whether a book needs to be secured from a different offsite location." *See* D.I. 25 at 16.  Defendants

are incorrect. To track the requirements of the Group 1 claims more closely (but still imperfectly), the shelves of Defendants' library would be stacked with individual pages from an assortment of books. And in response to a request for a composite chapter be generated using certain pages or portions of pages, the librarian would first need to identify whether any pages or portions already exist on the local shelves. Then the librarian would request that the "different offsite location" generate any remaining portions for the requested chapter and send those pages back to the librarian. Finally, the librarian reorders the page portions stored locally with those received from the offsite location to create the requested composite chapter. When viewed without the omission of limitations and without oversimplification, such a process hardly can be considered well known or routine. The asserted claims require more than just caching, and there is no evidence that the combination of elements required by the Group 1 claims is conventional.

### b.    Group 2 claims

The asserted claims from Group 2 include the same inventive steps described for the Group 1 claims and therefore claim patentable subject matter. The Group 2 claims further provide a specific mechanism for determining whether frames corresponding to a request for a virtual view are stored locally. *See* '609 Pat. at Col. 18:38-60. Among other things, the claims require: (1) creating a unique identifiable key of a request for a three-dimensional virtual view; (2) storing the unique

identifiable keys of prior requests for three-dimensional virtual views locally; (3) comparing the unique key of a current request to the unique key of prior requests; (4) if the value of a key for the current request is equivalent to a prior request, the system displays a frame stored locally associated with the prior request; and if the value is not equivalent to a key from a prior request, displaying a frame generated and transmitted by the server. *Id.* at Col. 18:42-60. As set forth in the step one analysis, these elements provide for improvements over the prior art and are not well-known, routine, or conventional.

Defendants argument to the contrary is misplaced. Defendants again oversimply and omit claim elements to support their contentions. Defendants also fail to consider the claim as a whole, and their analysis should be rejected.

The Group 2 claims are directed to a mechanism for allowing a web application to determine whether any frame of the requested views of the volume visualization dataset is stored on the local data storage medium. '609 Pat. at Col. 18:38-41. The claims describe, with specificity, how the system achieves the desired result, not the result itself, and are therefore patent eligible. *See e.g., Intellectual Ventures I LL v. Symantec Corp.*, 838 F.3d 1307, 1316 (Fed. Cir. 2016) (finding that when a claim directed to an abstract idea contains no restriction on how the result is accomplished and the mechanism is not described, then the claim is not patent-eligible).

c.    Group 3 claims

Assuming *arguendo* that the Group 3 claims are directed to an abstract idea, these claims also include an inventive step.  Like Groups 1 and 2, the asserted Group 3 claims require "the plurality of virtual views comprising a plurality of separate view frames."  *See* '609 Pat. at Col. 19:28-31.  The Group 3 claims further require, among other things, the user's request for a plurality of three-dimensional virtual views to include "a request for a lower image quality parameter for the frames, at a lower frame resolution, and a request for a higher image quality parameter for the frames, at a higher frame resolution."  *Id.* at Col. 19:31-35.  The claims further include creating both lower and higher image quality parameter frames, displaying these frames at the remote location, and that "after the lower image quality parameter frames is transmitted to the remote location, transmitting the higher image quality parameter frames from the server to the remote location while the remote location is displaying the lower image quality parameter frames.  *Id.* at 19:35-51.  The specification explains that "[a] lower image quality parameter for the frames may be transmitted over the Internet from the server [] to the user device [] at a faster rate than a high image quality parameter for the frames."  *Id.* at Col. 10:43-46.  The specification further explains that "[t]hese options allow one to use a lower quality image to facilitate delivery of high frame rates and once interaction is stopped, an image quality with highest fidelity may be restored."  *Id.* at Col. 10:58-61.

Accordingly, the claims require requesting, creating, and receiving both higher and lower image quality parameter versions of the same frame. Such redundancy is neither well-known, routine, or conventional. This nonconventional use of redundant frames improves the function of prior art systems by allowing them to function in low bandwidth environments.

Defendants again rely on the Klaus publication to support their motion, even though the patents issued despite Plaintiff's citation to Klaus. This single reference does not establish that the elements of the Group 3 claims were conventional. Further, the Klaus reference does not disclose providing a request for both higher and lower quality image parameter frames, creating such frames, or transmitting high quality image parameter frames after low quality frames. The Klaus reference only states that "the original video signal is decomposed into a low quality and high quality layer." D.I. 25-2 at 2. Defendants provide no other authority suggesting that transmitting low quality data before transmitting high quality data was well-known, routine, or conventional. *See* D.I. 25 at 18-19.

### D.    ALLEGATIONS REGARDING WILLFULNESS

The First Amended Complaint sufficiently pleads plausible facts in support of willful infringement—namely, (i) Plaintiff informed representatives of Client Outlook of Plaintiff's family of patents that included the asserted patents that had issued at that time covering the technology at issue, (ii) the representatives included

upon information and belief, the Global VP of Sales for Client Outlook, (iii) Client
Outlook continued its infringement of Plaintiff's patents through its eUnity viewer,
including in conjunction with Defendant Nuance, and (iv) Defendant Mach7
subsequently acquired all of Client Outlook and the eUnity viewer software, which
Defendant Mach7 continues to offer in conjunction with Defendant Nuance.  At
minimum, Client Outlook willfully infringed Plaintiff's patents until it was acquired
by Defendant Mach7 years later.

By acquiring all of Client Outlook, merging it into Mach7's own operations,
and continuing to offer and operate the same infringing eUnity viewer software,
Mach7 assumed the liabilities of the acquired predecessor-in-interest and continues
the same infringing commercial operations and contracts with Defendant Nuance as
the acquired predecessor-in-interest.  *See Elmer v. Tenneco Resins, Inc.*, 698 F.
Supp. 535, 540 (D. Del. 1988) (citing *Knapp v. North American Rockwell Corp*.,
506 F.2d 361, 363-64 (3d Cir. 1974)) ("a purchaser may be liable for the obligations
of the selling corporation in any one of the following four situations: (1) the
purchaser expressly or impliedly assumes such obligations; (2) the transaction
amounts to a consolidation or merger of the seller into the purchaser; (3) the
purchaser is merely a continuation of the seller; or (4) the transaction has been
entered fraudulently").  Accordingly, Plaintiff's willful infringement claim is
sufficiently pled.

## V.     CONCLUSION

The asserted claims of the patents-in-suit are directed to patent eligible subject matter under either step one or two of the *Alice* test.  The claims, when read correctly, are directed to improvements to the functionality of prior art systems.  The asserted claims allow computer systems to process and transmit large volume datasets on any Internet connection, including low bandwidth and high latency networks which was previously impractical or impossible.  Further, there are disputes regarding whether features of the asserted claim were well-known, routine, or conventional.  For at least these reasons, Defendants' motion to dismiss should be denied.

|                                            | **COLE SCHOTZ P.C.**                          |
|--------------------------------------------|-----------------------------------------------|
| Of Counsel:                                | */s/  Andrew L. Cole*                         |
|                                            | Andrew L. Cole (No. 5712)                     |
| Sean N. Hsu (*pro hac vice*)               | 500 Delaware Avenue, Suite 1410               |
| Rajkumar Vinnakota (*pro hac vice*)        | Wilmington, DE 19801                          |
| Gary Sorden (*pro hac vice*)               | (302) 652-3131 (Phone)                        |
| Vishal Patel (*pro hac vice*)              | acole@coleschotz.com                          |
| COLE SCHOTZ P.C.                           |                                               |
| 901 Main St., Suite 4120                   | *Attorneys for Plaintiff,*                    |
| Dallas, TX 75202                           | *AI Visualize, Inc.*                          |
| (469) 557-9390                             |                                               |
| shsu@coleschotz.com                        |                                               |
| kvinnakota@coleschotz.com                  |                                               |
| gsorden@coleschotz.com                     |                                               |
| vpatel@coleschotz.com                      |                                               |

Dated:  February 8, 2022

21

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

The undersigned counsel certifies that this filing complies with the type, font, and word limitations set forth in Judge Connolly's November 6, 2019 Standing Order.  According to the word processing system used to prepare it, the foregoing document contains 4,937 words, excluding the case caption, tables, and signature block.  The text of this document, including footnotes, was prepared in Times New Roman, 14 point font.

Dated:  February 8, 2022                    /s/  Andrew L. Cole
                                            Andrew L. Cole (No. 5712)